# United States Court of Appeals for the Federal Circuit

2006-1363

SONY ELECTRONICS, INC.,

Plaintiff-Appellant,

and

MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.,

Plaintiff-Appellant,

and

THOMSON, INCORPORATED,

Plaintiff,

and

VICTOR COMPANY OF JAPAN, LTD.,
and MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD.,

Plaintiffs-Appellants,

v.

GUARDIAN MEDIA TECHNOLOGIES, LTD.,

Defendant-Appellee.

Richard S. Gresalfi, Kenyon & Kenyon, of New York, New York, argued for plaintiff-appellant, Sony Electronics, Inc., and all other plaintiffs-appellants. With him on the brief for Sony Electronic, Inc. were Michelle Carniaux and Robert M. Pollaro.

Vincent J. Belusko, Morrison & Foerster LLP, of Los Angeles, California, for plaintiff-appellant, Mitsubishi Digital Electronics America, Inc. With him on the brief was J. Manena Bishop.

Morton Amster, Amster Rothstein & Ebenstein LLP, of New York, New York, for plaintiffs-appellants, Victor Company of Japan, Ltd. and Matsushita Electric Industrial Co., Ltd. With him on the brief was Michael J. Berger.

Richard L. Stanley, Howrey LLP, of Houston, Texas, argued for defendant-appellee. With him on the brief were Michael S. Dowler, Henry A. Petri, Jr., and Vidya Bala. Of counsel was Stephen L. Lundwall.

Appealed from: United States District Court for the Southern District of California

Senior Judge Rudi M. Brewster

# United States Court of Appeals for the Federal Circuit

2006-1363

SONY ELECTRONICS, INC.,

Plaintiff-Appellant,

and

MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.,

Plaintiff-Appellant,

and

THOMSON, INCORPORATED,

Plaintiff,

and

VICTOR COMPANY OF JAPAN, LTD.,
and MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD.,

Plaintiffs-Appellants,

v.

GUARDIAN MEDIA TECHNOLOGIES, LTD.,

Defendant-Appellee.

_____

DECIDED:  August 3, 2007

_____

Before NEWMAN, <u>Circuit Judge</u>, FRIEDMAN, <u>Senior Circuit Judge</u>, and PROST, <u>Circuit Judge</u>.

PROST, <u>Circuit Judge</u>.

These declaratory judgment actions were brought by Sony Electronics, Inc. ("Sony"), Mitsubishi Digital Electronics America, Inc. ("Mitsubishi"), Victor Company of Japan, Ltd. ("JVC"), Matsushita Electric Industrial Co., Ltd. ("Matsushita"), and Thomson, Inc. ("Thomson"), in the United States District Court for the Southern District of California. Each of the five plaintiffs (four of which are appellants in this appeal) sued Guardian Media Technologies, Ltd. ("Guardian"), seeking declaratory judgments that two patents owned by Guardian, U.S. Patent Nos. 4,930,158 ("'158 patent") and 4,930,160 ("'160 patent"), were not infringed by the plaintiffs, invalid, and not enforceable against the plaintiffs due to laches and equitable estoppel. After consolidating the cases, the district court granted Guardian's motion to dismiss for lack of subject matter jurisdiction. Sony Elecs., Inc. v. Guardian Media Techs., Ltd., No. 05-CV-1777-B (S.D. Cal. Mar. 16, 2006) ("Sony"). Sony, Mitsubishi, JVC, and Matsushita appeal the district court's dismissals. We vacate and remand for the district court to determine, in its discretion, whether to hear the actions.

## I. BACKGROUND

We take the following facts from the allegations in appellants' complaints and the declarations submitted by all of the parties. The relevant facts are undisputed; however, the parties dispute the legal conclusions that should be drawn from them.

The '160 patent generally relates to methods and apparatuses for blocking the viewing of certain television programs. Similar to the '160 patent, the '158 patent relates to methods and apparatuses for blocking the playing of certain programs recorded on a videotape or other medium. The patents describe a system in which users can selectively block the viewing or playing of programs that have particular

program classification codes. Such a system can be used, for example, by parents wishing to prevent their children from viewing television programs designated unsuitable for children. Both patents were issued on May 29, 1990, both list Peter S. Vogel as the inventor, and both were assigned to Guardian in November 2003.

## A. Sony

Sony sells televisions and DVD products that possess parental rating control technology, also referred to as "V-Chip" technology.[1] On September 24, 1999, an attorney acting on behalf of Peter S. Vogel sent Sony a letter, which stated (in pertinent part):

Notice of Patent Infringement

Subject: Sony product infringement of U.S. patents 4,930,158 & 4,930,160 and corresponding foreign patents.

Sir,

My associates and I represent Peter S. Vogel. It has come to our attention that Sony electronics products including DVD products e.g. DVD player DVP-S7700 and TVs, e.g. including KV-32XBR250, are using parental rating control technology invented by Peter S. Vogel and provided patent protection in the subject US patents (copies enclosed) and corresponding foreign patents. Specifically, the DVD players infringe at least claims 1, 4, 14 and 17 of U.S. patent 4,930,160 and claims 1, 12 and 14 of U.S. patent 4,930,158. The TVs similarly infringe the claims. The subject patents are basic to parental control systems and the v-chip system in particular and other parental rating control systems and devices.

Please contact myself . . . at the above address within ten days of the date of this letter in order to discuss this matter.

---

[1] Pursuant to section 551 of the Telecommunications Act of 1996, the Federal Communications Commission has adopted regulations requiring all thirteen-inch or larger television sets shipped or manufactured after January 1, 2000 to have a feature designed to enable viewers to block the display of all programs with a common parental guideline rating. See 47 U.S.C. § 330(c); 47 C.F.R. § 15.120. This technology is referred to as the "V-Chip." See Federal Communications Commission, http://www.fcc.gov/vchip (last visited May 21, 2007).

For your convenience I also enclose copies of the pertinent pages of the DVP-S7700 and KV-32XBR250 User manuals exemplifying use of the patented technology.

On October 4, 1999, Sony, through its counsel at Sony Corporation America, informed Vogel's attorney by letter that it was investigating the matter. The letter also asked Vogel's attorney to provide "claim charts specifically describing why . . . Vogel's patents are relevant to the Sony products identified in [the September 24] letter."

On October 28, 1999, Vogel's attorney provided the requested claim charts, accompanied by a letter containing the subject line: "Claim Charts indicating Sony product infringement of U.S. patents 4,930,158 & 4,930,160 and corresponding foreign patents." The letter asserted that Sony's DVP-S7700 model DVD player and KV-32XBR250 model TV each infringed eighteen specified claims of the '158 and '160 patents. The charts listed each claim alleged to be infringed by Sony and described, on a limitation-by-limitation basis, the basis for Vogel's belief that the accused product models infringed the claims.

Sony responded by letter on May 8, 2000, stating that it had completed its investigation and that it had "some serious questions about the validity" of the '158 and '160 patents. The letter stated that Sony believed that all of the asserted claims were invalid as either anticipated or obvious over certain prior art references identified in the letter. Vogel never responded.

Over four years later, on August 31, 2004, an attorney representing Guardian sent a letter to Sony Home Electronics Network Co.[2] requesting a meeting to discuss

---

[2] According to Sony's complaint, Sony Home Electronics Network Co. is a business unit of Sony Corporation. Sony Corporation is the ultimate parent company of Sony Electronics, Inc., one of the plaintiffs in this case.

the possibility of Sony taking licenses to a number of United States and foreign patents owned by Guardian related to parental control technology. The '158 and '160 patents were among the patents listed. The letter stated that Guardian was offering discounts to early licensees, as well as the option of a "paid up license" for the life of the patents in exchange for a lump sum payment. According to the letter, any license agreement would "likely include [compensation for] products sold since 1999 since that was when the United States Government mandated parental control functionality in televisions with a screen size of 13 inches or larger." It further mentioned that an unspecified court had awarded a royalty rate of $1.15 per unit "for a single U.S. Patent on corresponding technology." On October 26, 2004, Guardian sent another letter to Sony Home Electronics Network Co. requesting a response to its August 31, 2004 letter.

On December 3, 2004, Guardian sent a third letter. This letter stated that Sony's failure to respond was "unacceptable." It further stated that Guardian "require[d] that Sony explain in detail why it does not need a license to GUARDIAN's patents." Guardian requested a response by December 24, 2004, and restated its offer of a discounted license if Sony acted quickly.

Nearly two months later, on January 30, 2005, an attorney representing Guardian sent yet another letter to Sony Home Electronics Network Co. This letter requested a meeting during the week of February 7, 2005 and indicated that Guardian would soon be withdrawing its offer of a discounted license. On February 9, 2005, Sony, through its counsel at Sony Corporation of America, replied that it was not possible to meet with Guardian. Sony also requested that Guardian provide "claim charts setting forth the

specific basis for [Guardian's] allegations that Sony products infringe Guardian's V-chip patents."

On March 30, 2005, Sony sent Guardian a letter stating that it believed that the '158 and '160 patents were invalid. Attached to this letter was a copy of the letter Sony sent to Vogel's attorney on May 8, 2000, which set forth Sony's position that the patents were invalid in view of certain listed prior art references. Guardian responded by letter dated April 1, 2005, requesting a meeting later that month and warning that this meeting would be the last opportunity for Sony to obtain a discounted license. Sony replied on April 7, 2005, proposing that the parties meet in May and requesting that Guardian address the prior art identified in Sony's March 30, 2005 letter prior to the meeting.

Guardian responded by letter on April 12, 2005. This letter described the basis for Guardian's position that the prior art identified by Sony did not disclose each of the elements of the asserted claims of the '158 and '160 patents. Included with the letter were detailed charts, which compared, on a limitation-by-limitation basis, a number of the claims of the '158 and '160 patents to representative Sony products.[3] The accompanying letter stated that the infringement analyses in Guardian's claim charts were "applicable to all other Sony products that incorporate V-chip functionality."

---

[3] Guardian's claim charts contain two columns. The left column recites each claim limitation of an asserted claim of the '158 or '160 patent and the right column describes Guardian's position as to how a representative Sony product meets each limitation. For example, claim 1 of the '160 patent requires, among other things, the step of "receiving a program classification code descriptive of said video signal." That claim limitation is recited in the left column of the chart. Next to that limitation, in the right column, it states, "The SONY DKE-55XBR950 receives a program classification code description of the video signals it receives. See Exh. 1, KDE-55XBR950 Operating Instructions, pp. 109-10 (Using the Parent Menu); see also 37 C.F.R. § 15.120."

On June 21, 2005, the parties met in person. Specific details regarding this meeting are not apparent from the record. On July 7, 2005, Guardian sent a letter claiming that Sony's "royalty obligations far exceed $31,050,000." The letter went on to offer Sony a "fully paid-up license" for $9 million, which would "include each of Guardian's patents, and [would] cover every V-chip enabled product that Sony has sold and will sell for the life of each of the Guardian patents." The letter stated that the offer would expire on August 31, 2005. Sony did not respond to this letter. On August 24, 2005, Guardian wrote again, requesting a response.

Without any further communication, Sony filed a declaratory judgment action on September 14, 2005. Sony's complaint alleges that the '158 and '160 patents are not infringed by Sony, are invalid, and are unenforceable due to laches and equitable estoppel.

### B. Matsushita and JVC

Like Sony, Matsushita and JVC each sell televisions and DVD products that possess parental rating control technology.[4] And like Sony, Matsushita and JVC each received a letter in 1999 from an attorney acting on behalf of Peter S. Vogel. The letters sent to Matsushita and JVC were also entitled "<u>Notice of Patent Infringement</u>" and the text of the letters was substantially similar to the letter sent to Sony, except that the letter sent to Matsushita listed examples of specific Matsushita and Panasonic products alleged to infringe the '158 and '160 patents,[5] and the letter sent to JVC listed examples

---

[4] JVC is a majority-owned subsidiary of Matsushita.

[5] Matsushita sells Panasonic brand products in the United States through its wholly-owned subsidiary, Panasonic Corporation of North America.

of specific JVC products.

The record does not indicate whether JVC took any action after receiving the letter from Vogel's attorney. Matsushita, however, responded by letter dated April 20, 2000, stating that it had concluded that it did not need a license under the '158 and '160 patents because the asserted claims were not infringed or otherwise invalid in view of certain identified prior art references. Vogel's attorney never responded.

Guardian's attorney wrote to JVC on August 23, 2004, and to Matsushita on September 2, 2004. These letters were substantially similar to Guardian's August 31, 2004 letter to Sony. Like Guardian's letter to Sony, the letters to JVC and Matsushita mentioned a royalty rate of $1.15 per product for comparable technology, but stated that Guardian was offering a discount to early licensees. The letter also mentioned that Guardian was willing to "entertain a lump sum, paid-up license for the life of the patents, or a running royalty on products as they are sold." Either option, according to the letter, would "likely include [compensation for] those [products] sold since at least 1999, when the U.S. government first began requiring [V-chip] functionality in television sets thirteen inches or larger."

JVC wrote to Guardian on September 7, 2004, requesting that Guardian identify JVC products that "relate to the subject patents and provide [JVC] with any other information such as claim chart for [JVC's] better understanding." Matsushita wrote to Guardian on November 2, 2004, requesting that Guardian identify "the model numbers of [Matsushita's] products which [Guardian] believe[d] may be possibly related to the patents . . . [and] documents showing the relationships between the patent inventions and [Matsushita's] products."

Guardian responded to JVC by letter dated September 14, 2004. Attached to the letter was a list of over a hundred JVC product models that Guardian had identified as having "V-chip functionality." The letter further stated that the list was not exhaustive and that because Guardian's patents "relate to [V-chip] functionality, each JVC product that incorporates that functionality (whether TV, DVD, VCR, set top box, etc.) may require a license under [the] patents." Also attached to the letter were detailed claim charts, which compared, on a limitation-by-limitation basis, a number of the claims of the '158 and '168 patents to representative JVC products. The accompanying letter stated that the infringement analyses in Guardian's claim charts were "applicable to all other JVC products that incorporate V-chip functionality."

Guardian sent a very similar letter to Matsushita on November 15, 2004. Attached to the letter to Matsushita was a list of hundreds of Matsushita product models that Guardian asserted possessed "V-chip functionality." Like Guardian's letter to JVC, its letter to Matsushita stated that because Guardian's patents "relate to [V-chip] functionality, each Matsushita product that incorporates that functionality (whether TV, DVD, VCR, set top box, etc.) may require a license under [the] patents." Also attached to the letter to Matsushita were detailed claim charts, which compared, on a limitation-by-limitation basis, a number of the claims of the '158 and '168 patents to representative Matsushita products. The letter stated that the infringement analyses in the charts were "applicable to all other Matsushita products that incorporate V-chip functionality."

JVC responded by letter on October 8, 2004. JVC's letter stated that JVC was reviewing the matter but that it considered a rate higher than $1.15 to be "unrealistic." The letter also requested that Guardian identify all other companies that had taken or

had been offered a license. Guardian wrote back on October 12, 2004, stating that it would offer a 40% discount from the $1.15 per unit rate but that it would not disclose the identity of any of the companies that it was negotiating with. Attached to this letter was a draft license agreement. JVC responded on November 22, 2004, stating that Guardian's discounted rate was still too high for JVC to consider and asking what steps Guardian planned to take if JVC did not obtain a license. On December 1, 2004, Guardian wrote again, stating that it was "willing to discuss the exact discount" and requesting that JVC contact it as soon as possible "so that we may complete the terms of the license agreement that [Guardian] sent to you on October 12." On December 16, 2004, JVC instructed Guardian to direct any further communications to its outside counsel.

Matsushita replied to Guardian's November 15, 2004 letter on December 9, 2004. Matsushita's letter stated that Matsushita had previously come to the conclusion that Matsushita had not infringed any valid claim of the '158 and '160 patents and suggested that Guardian "consider the 1999-2000 assertion of the ['158 and '160] Patents which we understand was dropped after Mr. Vogel's counsel was advised as to the conclusions reached as a result of the study of the ['158 and '160] Patents by our U.S. counsel." Matsushita also instructed Guardian to direct any further correspondence to Matsushita's outside counsel. Later that month, Guardian offered to meet with Matsushita in person. Matsushita declined, and once again told Guardian to direct any further correspondence to its outside counsel.

On January 3, 2005, Guardian contacted Matsushita and JVC yet again—this time through their outside counsel—"to determine where the parties stand in the

licensing negotiation."[6]  On January 6, 2005, the outside counsel responded by letter, directing Guardian's attention to Matsushita's December 9, 2004 letter and stating that "the ball is in [Guardian's] court."  On February 8, 2005, the outside counsel sent Guardian a copy of Matsushita's April 20, 2000 letter to Vogel's attorney, which contained Matsushita's conclusion that the asserted claims were not infringed or otherwise invalid in view of certain identified prior art references.

Guardian responded by letter dated April 1, 2005, requesting a meeting later that month and warning that this meeting would be the last opportunity for Matsushita and JVC to obtain a discounted license.  In a letter dated April 5, 2005, Guardian asserted that the prior art identified by Matsushita did not disclose each of the elements of the asserted claims of the '158 and '160 patents.

Matsushita and JVC responded on April 15, 2005.  Their letter expressed disagreement with Guardian's position on the patents' validity and stated that Matsushita and JVC continued to believe that the asserted claims of the '158 and '160 patents were anticipated.  The letter requested that Guardian "withdraw its assertion of the ['158 and '160] Patents against Matsushita and JVC."

The parties' next few communications involved setting up a meeting on June 21, 2005.  Specific details regarding this meeting are not apparent from the record; however, on July 20, 2005, Guardian sent a letter responding to some issues apparently raised during the meeting regarding the disclosure of certain prior art references. Guardian's letter also claimed that Matsushita's "royalty obligations far exceed

---

[6]    Matsushita and JVC were represented by the same outside counsel. Letters to and from Matsushita and JVC dated on and after January 3, 2005, were sent to and received from outside counsel on behalf of both Matsushita and JVC.

$25,875,000," but offered Matsushita a "fully paid-up license" for $8.5 million.[7]  Just like the offer Guardian had made to Sony, its offer to Matsushita stated that the license would "include each of Guardian's patents, and it [would] cover every V-chip enabled product that Matsushita has sold and will sell for the life of each of the Guardian patents."  The letter stated that the offer would expire on September 15, 2005.

Matsushita and JVC responded by letter dated September 16, 2005, stating, "Matsushita and JVC have no interest in the Guardian Media offer of a license under the Guardian Media Patents and reject the July 20, 2005 offer."

That same day, Matsushita and JVC filed a declaratory judgment action.  Their complaint alleges that the '158 and '160 patents are invalid, not infringed by either Matsushita or JVC, and not enforceable against either Matsushita or JVC due to equitable estoppel and laches.

### C.  Mitsubishi

Mitsubishi Digital Electronics America, Inc. ("Mitsubishi") also sells televisions and DVD products that have parental rating control technology.  On October 6, 1999, an attorney acting on behalf of Peter S. Vogel sent Mitsubishi a letter identical to the "Notice of Patent Infringement" sent to Sony on September 24, 1999, except that the letter sent to Mitsubishi listed specific Mitsubishi products alleged to infringe the '158 and '160 patents.  On October 20, 1999, and again on February 9, 2000, Mitsubishi informed Vogel's attorney by letter that it was investigating the matter.

---

[7]     This letter does not indicate whether its license offer was also intended to cover JVC products; however, the subject line stated "Guardian Media Technologies Ltd.'s Offer To License U.S. Patent 4,930,150 [and] U.S. Patent No 4,930,160 . . . to Matsushita and JVC" (emphasis added).

In a letter to Vogel's attorney dated September 12, 2000, Mitsubishi stated that it had concluded that all of the asserted claims of the '158 and '160 patents, as well as any other claims that were potentially relevant to televisions and DVD players, were not infringed by Mitsubishi and were invalid in view of certain identified prior art. Vogel never responded.

Nearly four years later, on September 2, 2004, Guardian's attorney wrote to Mitsubishi Corporation, offering to license a number of United States and foreign patents owned by Guardian related to parental control technology, including the '158 and '160 patents. This letter is identical to Guardian's August 23, 2004 and September 2, 2004 letters to JVC and Matsushita, respectively, including mentioning an industry royalty rate of $1.15 per product, the possibility of a "lump sum, paid-up license for the life of the patents," and that any license would "likely include [compensation for] those [products] sold since at least 1999, when the U.S. government first began requiring [V-chip] functionality in television sets thirteen inches or larger." On October 18, 2004, Guardian sent another letter to Mitsubishi Corporation, requesting a response to Guardian's September 2, 2004, letter.

Mitsubishi Corporation responded on October 28, 2004, asking Guardian to identify "specific products that are manufactured or sold by Mitsubishi Corporation that might benefit from [Guardian's] Patents." On November 3, 2004, Guardian replied, listing specific examples of Mitsubishi television models and DVD player models that it considered "pertinent" to its license offer because of their "parental control (a.k.a. V-chip) functionality." The letter further stated that "each Mitsubishi product that

incorporates that functionality (whether TV, DVD, VCR, set top box, etc.) may require a license under [Guardian's] patents."

On November 5, 2004, Mitsubishi Corporation informed Guardian that it was not the appropriate entity to be corresponding with. That same day, Guardian's attorney forwarded its previous correspondence with Mitsubishi Corporation to Mitsubishi Electric Corporation.[8] On December 2, 2004, counsel for Mitsubishi acknowledged receipt of Guardian's correspondence and stated that Mitsubishi would contact Guardian after Mitsubishi had an opportunity to consider Guardian's offer. The next contact between the parties occurred on December 6, 2004, when Guardian sent Mitsubishi a draft license agreement.

Later that month, Guardian offered to meet with Mitsubishi in person. In a letter dated January 5, 2005, Mitsubishi declined to meet with Guardian and repeated that it would contact Guardian after it had an opportunity to review Guardian's offer. On February 3, 2005, and again on March 10, 2005, Guardian wrote to Mitsubishi, requesting a response to its offer of a license. Guardian's March letter stated that if Mitsubishi did not respond, Guardian "would be forced to assume that Mitsubishi has no interest in a business resolution to these issues."

Mitsubishi responded by letter dated March 11, 2005. The letter requested that Guardian "withdraw [its] assertion of [the '158 and '160] patents against [Mitsubishi]." Attached to this letter was a copy of the letter that Mitsubishi sent to Vogel's attorney on September 12, 2000, which explained Mitsubishi's position that the patents were invalid

---

[8] Mitsubishi Electric Corporation owns Mitsubishi Digital Electronics America, Inc., one of the plaintiffs.

in view of certain identified prior art references and unenforceable. Mitsubishi's March 11 letter nevertheless stated that it would be available to listen to a presentation by Guardian if Guardian still believed that its patents were valid and infringed by Mitsubishi.

Guardian responded by letter on April 1, 2005. This letter is very similar to the letters Guardian sent to Sony, Matsushita, and JVC on April 1, 2005. Like the other letters, Guardian's letter to Mitsubishi requested a meeting later that month and warned that the meeting would be the last opportunity for Mitsubishi to obtain a discounted license.

In another letter to Mitsubishi, also dated April 1, 2005, Guardian addressed the prior art identified in Mitsubishi's March 2005 letter, and described in detail the basis for its conclusion that the '158 and '160 patents were not invalid over that prior art. Guardian also requested that Mitsubishi provide the basis for its belief that the patents were unenforceable. Finally, Guardian claimed that Mitsubishi owed past royalties that "greatly exceed[ed]" $4.37 million for sales of televisions and DVD players, but offered Mitsubishi a "fully paid-up license" for $4 million. Similar to the offer Guardian would later make to Sony on June 21, 2005, Guardian's offer to Mitsubishi stated that the license would "include each of Guardian's patents, and it [would] cover every V-chip enabled product that Mitsubishi has sold and will sell for the life of each of the Guardian patents." The letter stated that the offer would expire on May 20, 2005.

Representatives for the parties met in person on June 23, 2005. Mitsubishi alleges (and Guardian does not dispute) that at the meeting Guardian's attorney "went through Guardian's position on infringement and validity" and Mitsubishi's attorney "reiterated [Mitsubishi's] positions on infringement and validity and raised additional prior

art." On July 20, 2005, Guardian sent a letter to Mitsubishi responding to some issues apparently raised during the meeting regarding the disclosure of a particular prior art reference. On August 31, 2005, Guardian wrote Mitsubishi yet again, this time requesting a response to its April 1, 2005 license offer.

Mitsubishi responded by letter dated September 13, 2005, which provided, in pertinent part:

> We continue to believe, as we have indicated in our letters and at the June 23, 2005 meeting, that the Guardian patents are clearly invalid based on prior art of which you are aware, and therefore cannot be infringed. Your letter of July 20, 2005 addressing certain prior art references has not changed our position. We are therefore not interested in a license.

The next day, Mitsubishi filed a declaratory judgment action. Mitsubishi's complaint alleges that the '158 and '160 patents are not infringed by Mitsubishi, are invalid, and are unenforceable due to laches and equitable estoppel.

## D. Patent reexamination

On September 26, 2005, less than two weeks after filing their complaints, Sony, Mitsubishi, Matsushita, and JVC (along with Thomson, who had also filed a declaratory judgment complaint against Guardian) filed with the United States Patent and Trademark Office a request for ex parte reexamination of the '160 patent. Soon after, on October 13, 2005, the plaintiffs filed a request for ex parte reexamination of the '158 patent. The United States Patent and Trademark Office granted the requests on November 23, 2005, and December 13, 2005, respectively.

## E. Proceedings before the district court

On January 10, 2005, the district court, on its own motion, consolidated the suits filed by Sony, Mitsubishi, Matsushita, JVC, and Thomson for purposes of pretrial

proceedings. Shortly thereafter, on January 13, 2005, Guardian filed a motion to dismiss the plaintiffs' complaints for lack of subject matter jurisdiction. That same day, the plaintiffs filed a joint motion to stay the district court cases pending the reexamination of the '158 and '160 patents.

After hearing oral argument on the pending motions, the district court granted Guardian's motion to dismiss for lack of subject matter jurisdiction, holding that there was no "actual controversy" between Guardian and any of the plaintiffs. Sony, slip op. at 7-16. The court first observed that Guardian had not expressly threatened to sue any of the plaintiffs for patent infringement. Id., slip op. at 10. In addition, the court held that none of Guardian's actions or correspondence amounted to an "implicit threat of immediate litigation." Id., slip op. at 16. Accordingly, the court held that it lacked jurisdiction to entertain the declaratory judgment actions. Id.

The court further stated that even if it did have jurisdiction, there were two reasons why it would exercise its discretion not to hear the cases. Id., slip op. at 17. First, the court considered the jurisdictional question to be "close." Id. Second, the court believed that "the facts as a whole create[d] an appearance that Plaintiffs filed these lawsuits as an intimidation tactic to gain leverage in the licensing negotiations." Id., slip op. at 18. The court denied the plaintiffs' motion to stay as moot. Id.

Sony, Mitsubishi, Matsushita, and JVC appeal the district court's dismissal of the consolidated cases. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II. ANALYSIS

### A

The main question we must answer in this case is whether the facts show that

there is an "actual controversy" between Guardian and each of the appellants within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Because the relevant facts are undisputed, we review de novo the district court's decision to dismiss the consolidated cases for lack of an actual controversy. SanDisk Corp v. STMicroelectronics, Inc., 480 F.3d 1372, 1377 (Fed. Cir. 2007); Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988).

Sony, Matsushita, JVC, and Mitsubishi (collectively, "appellants") argue that the district court erroneously required each appellant to establish that it faced an express or implicit threat of immediate litigation. Appellants argue that the 1999 letters from Vogel, the previous owner of the '158 and '160 patents, amount to "express charge[s] of infringement," which should be imputed to Guardian for purposes of determining whether there is an actual controversy. Citing Arrowhead, 846 F.2d at 736, appellants maintain that an express charge of infringement alone is sufficient to establish an actual controversy under the correct legal standard.

In addition, each of the appellants also argues that (while not required) it has demonstrated that the totality of the circumstances gave rise to a reasonable apprehension that Guardian would file an infringement suit against it. For example, Sony argues that the letters sent by Guardian in 2004 and 2005—including the detailed charts comparing certain claims of the '158 and '160 patents to representative Sony products—establish that Guardian "had reached a studied and considered determination" that Sony was infringing. Id. at 738. According to Sony, these letters thus demonstrate that Sony's apprehension of suit was reasonable. Sony and the other

appellants also point out that the negotiations between appellants and Guardian, to the extent any occurred, had ended by the time these suits were filed.

Guardian, on the other hand, argues that the district court properly dismissed each of the appellants' complaints for lack of an actual controversy. According to Guardian, an actual controversy (and thus jurisdiction) arises only after an express or implicit threat of litigation by the patentee. Guardian points out that it never expressly threatened any of the appellants with an infringement suit. In addition, Guardian argues that, even if Vogel's 1999 letters are imputed to it, and even if those letters are considered to be threats of litigation, the letters should be given minimal weight because four years passed without any further communication from Vogel. According to Guardian, Vogel's letters, therefore, cannot support a conclusion that litigation was imminent.

Guardian also argues that none of the appellants can establish that they had a reasonable apprehension of suit based on Guardian's communications in 2004 and 2005. Guardian states that its letters to appellants in 2004 and 2005 were "simply part of Guardian's efforts to license its patents" and were silent regarding the possibility of litigation. According to Guardian, its communications made clear that it at all times was willing to negotiate license agreements and there is no evidence to suggest that it would have ever sued any of the appellants.

Following oral argument, we permitted the parties to submit supplemental briefs to address the impact on this appeal of the Supreme Court's recent decision in MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764 (2007). In its supplemental brief, Guardian argues that the Supreme Court's decision in MedImmune did not alter this

court's test for determining whether there is an actual controversy in suits requesting a declaration of patent noninfringement, invalidity, or unenforceability. Appellants, on the other hand, argue that the Supreme Court's decision in MedImmune represents a rejection of this court's traditional "reasonable apprehension of suit" test. Appellants argue that application of the correct legal standard, as set forth in MedImmune, requires us to reverse the district court's dismissals.

B

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The phrase "case of actual controversy" "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, 127 S. Ct. at 771; Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937).

The Supreme Court has not articulated a bright-line rule for distinguishing those cases that satisfy the actual controversy requirement from those that do not. Indeed, it has stated that "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941). Instead of fashioning a precise test, the Supreme Court has required only that the dispute be "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t]

of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" MedImmune, 127 S. Ct. at 771 (quoting Aetna, 300 U.S. at 240-41). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Md. Cas., 312 U.S. at 273.

Prior to the Supreme Court's decision in MedImmune, this court applied a two-part test to determine whether there was an actual controversy in suits requesting a declaration of patent noninfringement, invalidity, or unenforceability. See, e.g., EMC Corp. v. Norand Corp., 89 F.3d 807, 811 (Fed. Cir. 1996); Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051, 1052 (Fed. Cir. 1995); Arrowhead, 846 F.3d at 736. One prong of the test examined whether the declaratory judgment plaintiff actually produced or was prepared to produce an allegedly infringing product. The other prong looked to see whether conduct by the patentee had created on the part of the declaratory judgment plaintiff a reasonable apprehension that the patentee would file suit if the allegedly infringing activity continued. EMC, 89 F.3d at 811; Phillips, 57 F.3d at 1052; Arrowhead, 846 F.2d at 736. In MedImmune, however, the Supreme Court abrogated our "reasonable apprehension of suit" test, stating that the test conflicted with its decisions in Maryland Casualty and Aetna and was in tension with its decision in Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83 (1993). MedImmune, 127 S. Ct. at 774 n.11; see also SanDisk, 480 F.3d at 1380 ("The Supreme Court's opinion in MedImmune represents a rejection of our reasonable

apprehension of suit test."); Teva Pharms. USA, Inc. v. Norvartis Pharms. Corp., 482 F.3d 1330, 1339 (Fed. Cir. 2007). As a result, our post-MedImmune decisions, while not attempting to define the outer boundaries of declaratory judgment jurisdiction, have made clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties. SanDisk, 480 F.3d at 1380-81; Teva, 482 F.3d at 1339.

In SanDisk, we held that a district court had jurisdiction over a suit requesting a declaration that a patent was invalid and not infringed even though the patentee had not threatened the declaratory judgment plaintiff with an infringement suit. There, the patentee—prior to the filing of the complaint—presented the plaintiff with "a detailed presentation which identified, on an element-by-element basis," the manner in which the patentee believed that the plaintiff's products infringed specific claims of the patentee's patents. Id. at 1382. In addition, the patentee "liberally referred to [the plaintiff's] present, ongoing infringement of [the] patents and the need for [the plaintiff] to license those patents." Id. The patentee also presented the plaintiff with "a packet of materials, over 300 pages in length, containing, for each of [the] fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of [the plaintiff's] products, and diagrams showing a detailed infringement analysis of [the plaintiff's] products." Id. The plaintiff, on the other hand, disagreed with the patentee's analysis and maintained that it did not need a license. We held that such circumstances evinced an actual controversy within the meaning of the Declaratory Judgment Act.

In so holding, we declined to hold that the patentee's earlier statement that it had "absolutely no plan whatsoever to sue" the plaintiff somehow eliminated the controversy

and thus prevented the plaintiff from maintaining a declaratory judgment suit. Id. at 1382-83. We also declined to hold that the patentee's apparent continued willingness to engage in licensing discussions prevented the plaintiff from maintaining a declaratory judgment suit. Id. at 1382 n.3 ("[A] party to licensing negotiations is of course within its rights to terminate negotiations when it appears that they will be unproductive."). Instead, we recognized that "jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." Id. at 1381. Accordingly, we did not require the plaintiff to put itself at further risk by continuing to engage in the allegedly infringing activity before seeking a declaration of its rights.

Indeed, as we have previously acknowledged, the Declaratory Judgment Act was intended to fix the problem that arises when the other side does not sue. See Minn. Mining & Mfg. Co. v. Norton Co., 929 F.2d 670, 673 (Fed. Cir. 1991) ("In promulgating the Declaratory Judgment Act, Congress intended to prevent avoidable damages from being incurred by a person uncertain of his rights and threatened with damage by delayed adjudication."); Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 956 (Fed. Cir. 1987) ("[T]he purpose of the Declaratory Judgment Act . . . in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights."). Before the Declaratory Judgment Act, a patent owner engaging in "extra-judicial patent enforcement" tactics rendered its competitors

> helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an in terrorem choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

Arrowhead, 846 F.2d at 735.

C

1. Sony

Applying the standard articulated by the Supreme Court, we think it is clear that, at the time that Sony filed its complaint, an actual controversy had arisen between Sony and Guardian within the meaning of the Declaratory Judgment Act. The dispute is, without a doubt, "definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna, 300 U.S. at 240-41.

Prior to Sony filing its complaint, the parties had taken adverse positions regarding whether Sony's sale of products possessing parental rating control technology infringed any valid claims of the '158 and '160 patents. On the one side, Guardian communicated to Sony its position that certain identified Sony products infringed the '158 and '160 patents. For example, Guardian provided Sony with detailed infringement analyses, which compared, on a limitation-by-limitation basis, a number of the claims of the '158 and '160 patents to specific Sony products. Guardian further alleged that its infringement analyses applied to all other Sony products possessing "V-chip functionality," i.e., parental rating control technology, and asserted that it was thus entitled to royalties exceeding $31 million. Guardian also communicated its position that the prior art identified by Sony did not disclose every element of the asserted claims. In short, Guardian's position was that the '158 and '160 patents were valid and infringed by Sony and that Guardian was therefore entitled to past and future royalties based on

that infringement. On the other side, Sony maintained that the asserted claims of the '158 and '160 patents were invalid in view of certain identified prior art references.[9]

Nothing about this dispute makes it unfit for judicial resolution. Sony does not request "an opinion advising what the law would be upon a hypothetical state of facts." Id. at 241. Indeed, Guardian has explicitly identified the patents it believes that Sony infringes, the relevant claims of those patents, and the relevant Sony products that it alleges infringe those patents. Sony has identified the specific prior art references that it believes render the asserted claims invalid. In the words of the Supreme Court, the parties' dispute "is manifestly susceptible of judicial determination. It calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts." Id. at 242.

In so holding, we reject Guardian's suggestion that there can be no jurisdiction in the courts because it was at all times willing to negotiate a "business resolution" to the dispute. In SanDisk, we recognized that a patentee's apparent continued willingness to engage in licensing negotiations does not prevent a plaintiff from maintaining a declaratory judgment suit. 480 F.3d at 1382. Accordingly, even if the parties' interactions in this case could be characterized as "negotiations," Sony was within its rights to terminate them when it determined that further negotiations would be unproductive. Id. Although Guardian may have wanted to negotiate with Sony, Sony was not required to negotiate with Guardian.

---

[9] We need not decide whether Vogel's correspondence with Sony and the other appellants in 1999 should be imputed to Guardian because we hold that the communications between Guardian and each of the appellants during 2004 and 2005 evince actual controversies within the meaning of the Declaratory Judgment Act.

In short, because Guardian asserts that it is owed royalties based on specific past and ongoing activities by Sony, and because Sony contends that it has a right to engage in those activities without a license, there is an actual controversy between the parties within the meaning of the Declaratory Judgment Act. See id. at 1381 ("[At least] where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights."). The district court, therefore, erred in dismissing Sony's complaint for lack of subject matter jurisdiction.

## 2. Matsushita and JVC

For the same reasons, we also conclude that there are actual controversies between Matsushita and Guardian and between JVC and Guardian. Prior to this suit, the parties took adverse positions regarding whether the sale of Matsushita and JVC products possessing parental rating control technology infringed any valid claims of the '158 and '160 patents. For example, Guardian's letters included detailed infringement analyses, which compared a number of claims of the patents to identified Matsushita and JVC products. Guardian further alleged that its infringement analyses applied to all products with "V-chip functionality," i.e., parental rating control technology, and asserted that it was thus entitled to royalties exceeding $25 million. JVC and Matsushita, on the other hand, maintained that the asserted claims of the '158 and '160 patents were invalid as anticipated by certain identified prior art references.

Like the dispute between Sony and Guardian, the disputes between Matsushita and Guardian and between JVC and Guardian are "definite and concrete" and not unfit for judicial resolution. Aetna, 300 U.S. at 240-41. Guardian asserts that it is owed royalties based on specific past and ongoing activities by JVC and Matsushita, and JVC and Matsushita contend that they have a right to engage in those activities without a license. Based on all of the undisputed evidence, we hold that there are actual controversies between Matsushita and Guardian and between JVC and Guardian within the meaning of the Declaratory Judgment Act. Consequently, we hold that the district court erred in dismissing the complaint for lack of subject matter jurisdiction.

### 3. Mitsubishi

We also think it is clear that there is an actual controversy between Mitsubishi and Guardian. Prior to this suit, Mitsubishi and Guardian took adverse positions regarding whether Mitsubishi's sale of products possessing parental rating control technology infringed any valid claims of the '158 and '160 patents. On one hand, Guardian's letters to Mitsubishi clearly conveyed Guardian's position that any Mitsubishi product having "V-chip functionality," i.e., parental rating control technology, infringed the '158 and '160 patents—and Guardian does not argue otherwise. For example, Guardian's September 2, 2004 letter stated that Guardian was willing to license the '158 and '160 patents and that any license would "likely include [compensation for] those [products] sold since at least 1999, when the U.S. government first began requiring [V-chip] functionality in television sets thirteen inches or larger." Guardian's November 3, 2004 letter identified specific models of Mitsubishi televisions and DVD players that Guardian alleged "support parental control (a.k.a. V-chip) functionality" and were, thus,

stated to be "pertinent to Guardian's [September 2, 2004] license offer." The letter went on to state that the list of "pertinent" models was not exhaustive and that "each Mitsubishi product that incorporates [V-chip] functionality (whether TV, DVD, VCR, set top box, etc.) may require a license." Then, in an April 1, 2005 letter, Guardian offered Mitsubishi a "fully paid-up license" for $4 million, which would "include each of Guardian's patents, and it [would] cover every V-chip enabled product that Mitsubishi has sold and will sell for the life of each of the Guardian patents." Without a doubt, these letters conveyed to Mitsubishi that Guardian had made a determination that every Mitsubishi product possessing a parental rating control feature infringed Guardian's patents. In addition, Guardian also communicated its position that the prior art identified by Mitsubishi did not disclose every element of the asserted claims. Mitsubishi, on the other hand, always maintained that it did not need a license because the '158 and '160 patents were invalid in view of certain identified prior art references.

Like the other disputes, the dispute between Mitsubishi and Guardian is not hypothetical, but "definite and concrete," and susceptible of judicial resolution. Aetna, 300 U.S. at 240-41. Guardian asserts that it is owed royalties based on specific past and ongoing activities by Mitsubishi, and Mitsubishi contends that it has a right to engage in those activities without a license. After examining all of the undisputed evidence, we believe that the circumstances "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Md. Cas., 312 U.S. at 273. Accordingly, we hold that the district court erred in dismissing Mitsubishi's complaint for lack of subject matter jurisdiction.

D

Even though we hold that there are actual controversies between Guardian and each of the appellants within the meaning of the Declaratory Judgment Act, Guardian urges us to affirm the district court's dismissals on discretionary grounds. The Declaratory Judgment Act states that courts "may" grant relief; it does not require courts to grant relief. 28 U.S.C. § 2201(a). Consequently, the Supreme Court has held that the Act confers on federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). Moreover, the Supreme Court has concluded that it is appropriate to vest district courts with that discretion "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." Id. at 289.

Our review of a district court's decision to decline jurisdiction is reviewed under a deferential abuse of discretion standard. Id. at 289-90; EMC, 89 F.3d at 813. If a district court's decision is consistent with the purposes of the Declaratory Judgment Act and considerations of wise judicial administration, it may exercise its discretion to dismiss (or stay) the case. See Wilton, 515 U.S. at 288 ("In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."); EMC, 89 F.3d at 813-14 ("[A]s long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad discretion to refuse to entertain a declaratory judgment action."); Serco Servs. Co. v. Kelley Co., 51 F.3d 1037, 1039 (Fed. Cir. 1995)

(a court may decline to hear a declaratory judgment action if it decides that the investment of time and resources would not be "worthwhile").

But the district court's discretion is not without bounds. A district court may be held to have abused its discretion when "(1) the court's decision was clearly unreasonable, arbitrary, or fanciful; (2) the decision was based on an erroneous conclusion of law; (3) the court's findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision." Minn. Mining, 929 F.2d at 673.

In this case, the district court articulated "two primary reasons" underlying its decision to decline jurisdiction. Sony, slip op. at 17. The district court's first reason—its belief that that this is a "close case"—is based on an erroneous conclusion of law. The district court believed the case to be close because

> [e]ven if some of Guardian's language can be construed as implied threats, the overall tone of the interactions between the parties was one of discussion and negotiation. This case is distinguishable from Capo [Inc. v. Dioptics Med. Prods., Inc., 387 F.3d 1352 (Fed. Cir. 2004)], where the patentee 'minced no words, left no doubt' and had already filed three lawsuits against others, thereby, creating an objectively reasonable apprehension that litigation would follow the failed negotiations. Capo, 387 F.3d at 1356-58 (court abused discretion by declining to resolve dispute over which jurisdiction existed). Here, Guardian indicated by express statements and by its actions that it sought a business solution.

Id. As the foregoing passage makes clear, the district court considered the question of jurisdiction to be close under the "reasonable apprehension of suit" test. But that test, as explained above, is the wrong test. Accordingly, the district court's conclusion that this is a close case under the "reasonable apprehension of suit" test cannot support its decision to decline jurisdiction.

We are also troubled by several aspects of the second reason underlying the district court's decision to decline jurisdiction: its belief that "the facts as a whole create an appearance that Plaintiffs filed these lawsuits as an intimidation tactic to gain leverage in the licensing negotiations." Id., slip op. at 18. The district court noted that appellants' decision to file their suits nearly simultaneously "indicates a strategic motive 'to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also to undermine the value of the patent so as to impede its sale or licensing to a third party.'" Id. (quoting EMC, 89 F.3d at 814). As further support for its conclusion that appellants filed this litigation to improperly obtain a more favorable bargaining position, the district court relied on Guardian's argument that the pendency of this litigation had adversely affected Guardian's licensing negotiations with third parties.

Based on the record before us, however, we do not think that a nefarious motive on the part of the appellants can be so easily inferred. Although the district court cited EMC in coming to its conclusion that appellants filed these lawsuits to gain leverage in future licensing negotiations with Guardian, the circumstances in that case were very different. There, we held that it was not an abuse of discretion for a district court to decline to exercise its discretion to hear a suit when the declaratory judgment plaintiff called the defendant the day after the suit was filed "and explained that the declaratory judgment complaint had been filed as 'merely a defensive step' and that [the plaintiff] 'would like to continue to discuss with you all the options hopefully in a more meaningful manner over the near term.'" EMC, 89 F.3d at 815. We stated that it was not inappropriate under those circumstances for the district court to view the declaratory

judgment complaint "as a tactical measure filed in order to improve [the plaintiff's] posture in the ongoing negotiations—not a purpose that the Declaratory Judgment Act was designed to serve." Id.

Here, unlike in EMC, there is no affirmative evidence to suggest that appellants filed this suit in order to obtain a more favorable bargaining position in any ongoing license negotiations. In addition, while this litigation may have had the effect of weakening Guardian's bargaining position relative to third parties, we do not think it appropriate to infer that appellants, therefore, filed this suit as an intimidation tactic to gain leverage in any future negotiations with Guardian. Similarly, we do not think it appropriate under the circumstances of this case to draw any inference from appellants' decisions to file these lawsuits simultaneously. Even if these suits have had the effect of placing appellants in a more favorable negotiating position, that effect is not a sufficient reason to decline to hear the suit.

Nevertheless, given the circumstances here, we think it appropriate to remand to the district court for it to reconsider whether to exercise its discretion to dismiss (or stay) these cases. On remand, the district court is free to consider whether entertaining the cases would be consistent with both the purposes of the Declaratory Judgment Act and principles of wise judicial administration. For example, in determining whether to allow these cases to proceed, the district court may wish to take into account that the '158 and '160 patents are currently undergoing reexamination at the request of appellants, and that appellants have requested a stay pending the outcome of the reexamination proceedings.

## III. CONCLUSION

For the reasons stated above, we vacate the district court's dismissals and remand for the district court to determine in its discretion whether to entertain appellants' declaratory judgment suits.

<u>VACATED AND REMANDED</u>